[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On September 22, 1994, the plaintiff, Cheryl L. Selden, filed a complaint against the defendant, Wayne F. Selden, seeking a dissolution of the parties' marriage. On April 28, 1995, the matter was tried to the court, O'Connell, J. Thereafter, on May 12, 1995, the parties filed memorandums of law in support of their respective positions. Additionally, on May 17, 1995, the plaintiff filed a supplemental memorandum of law in response to the defendant's trial memorandum. The parties have stipulated that the only issue remaining before the court is the division of the net proceeds from the sale of a home located at Route 1, Willard, North Carolina. Plaintiff's Memorandum of Law, filed May 12, 1995 ("Plaintiff's Brief), at 2.
In light of the above, the court makes the following relevant findings of fact: The parties were married in the state of Connecticut on December 30, 1984. Complaint, ¶ 1. Approximately three years later, the defendant's employer transferred him to the state of North Carolina. Accordingly, the plaintiff sold one of her homes, located in Haddam, Connecticut, that she had owned as separate property prior to the parties' marriage. Plaintiff's Brief, at 3. With the proceeds of this sale, the plaintiff and the defendant acquired a home in North Carolina, in both of their names, at a price of $128,000.00 Plaintiff's Brief, at 3. Additionally, the parties took a first mortgage on the home, in both of their names, in the amount of $15,000.00. Testimony.
On January 6, 1992, while living in North Carolina, the parties entered into a separation/property settlement agreement ("agreement"). Plaintiff's Exhibit A. Therein, the plaintiff CT Page 7001 quitclaimed her one-half interest in the parties' home in exchange for a promissory note executed by the defendant in the amount of $100,000.00, payable monthly, and an agreement by the defendant that he would assume sole responsibility for the $15,000.00 mortgage on the property. Plaintiff's Brief, at 3. Thereafter, in February, 1992, the plaintiff returned to Connecticut, while the defendant remained in the home in North Carolina. Testimony; Plaintiff's Brief, at 3; Defendant's Memorandum of Law, filed May 12, 1995 ("Defendant's Brief"), at 3-4. The defendant did not pay the monthly sum due under the terms of the note given to the plaintiff pursuant to the parties' agreement. Plaintiff's Brief, at 3.
In March, 1992, the plaintiff returned to North Carolina and resided in the subject home for approximately three months. Testimony; Plaintiff's Brief, at 4; Defendant's Brief, at 4. During this time, the defendant came and went 8-10 times, sometimes staying with the plaintiff for a few days at a time, and the parties engaged in sexual relations. Testimony; Defendant's Brief, at 4. The home was subsequently quitclaimed back by the defendant to the plaintiff in May, 1992, in exchange for the plaintiff's release of the $100,000.00 note. Testimony; Plaintiff's Brief, at 4; Defendant's Brief, at 4.
Approximately one month later, in June, 1992, the defendant moved out of the premises permanently. Defendant's Brief, at 5-6. From January, 1992, through June, 1992, the defendant made all utility payments, as well as mortgage payments in excess of $170.00 per month. Testimony; Defendant's Brief, at 4-5; Defendant's Exhibit #10. The plaintiff subsequently sold the home for $136,000.00, paid off the $15,000.00 mortgage on the property, and returned to the state of Connecticut, where she then filed for divorce.
The defendant, at the trial of this matter, alleged that the terms of the parties' agreement should not be enforced by this court, because he was under duress at the time he entered into said agreement. Additionally, in his memorandum of law, the defendant argues that the terms of said agreement should not now be enforced, in light of the fact that the parties resumed their marital relations subsequent to their signing of the agreement. Rather, the defendant argues, he is entitled to one-half of the net proceeds arising from the sale of the North Carolina property, under the law of equitable distribution. CT Page 7002
In the alternative, the defendant argues that, in the event that the court does find the agreement valid and enforceable, the plaintiff is entitled to no more than $100,000 of the net proceeds from the sale of the property, as this is the amount due to the plaintiff under the agreement itself. It follows, the defendant argues, that he is entitled to all proceeds from the sale of the property, minus the broker's fees, the mortgage payoff of $15,000, and attorney's fees in the amount of $500. Additionally, the defendant requests credit and reimbursement for all mortgage payments and other expenses connected with the property from the time he vacated it in June, 1992, and turned it over to the plaintiff. Defendant's Exhibit #10.
The plaintiff argues that the agreement entered into by the parties in North Carolina should be held valid, and that its terms should be enforced by this court, because the defendant has failed to establish that he was under duress at the time he entered into the agreement. Additionally, the plaintiff argues that, despite the defendant's assertions to the contrary, the parties did not "reconcile" or "resume their marital relations" after the execution of their agreement, because sexual intercourse — in and of itself — is insufficient to constitute resumption of marital relations under North Carolina law. Further, the plaintiff argues that, even if the parties did "reconcile" or "resume marital relations," such reconciliation and/or resumption should have no legal effect on the parties agreement, because the separation provisions of the agreement were entirely independent of, and unrelated to, the property settlement provisions of the agreement. Finally, the plaintiff argues that any cohabitation between the parties after the execution of their separation agreement should have no effect on said agreement, because ¶ 13 of said agreement specifically provides that:
 in the event of reconciliation and resumption of the marital relationship between the parties, the provisions of this Agreement for settlement of the parties' property rights will, nevertheless, continue in full force and effect without abatement of any term or provision hereof except as otherwise provided by written Agreement duly executed by each of the parties as of the date of the reconciliation.
(Emphasis added.). CT Page 7003
The plaintiff asserts that she received $100,000.00 in net proceeds as a result of the sale of the North Carolina property, and that she is entitled to this full amount under the agreement.
DISCUSSION
The Connecticut Supreme Court has recognized that a contract may properly be governed in its interpretation by the laws of the state where it was executed, and where the parties thereto were domiciled at the time of such execution. Weil v. Poulsen,121 Conn. 281, 286 (1936). Moreover, as pointed out by Judge Lewis in a recent decision:
 Connecticut law agrees with 1 Restatement (Second), Conflict of Laws, 187 (1971), that parties are free to choose their own forum except under two circumstances, viz., (a) if [North Carolina] had no substantial relationship to the matter, or (b) if [North Carolina] law was contrary to our fundamental policies and law, and this state had a materially greater interest than [North Carolina] in determining the controversy . . . .
Elgar v. Probate Appeal, Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. 119720 (February 9, 1995, Lewis, J.).
In the present case, the parties' agreement was executed in the state of North Carolina, at a time when the parties were both domiciled there. Additionally, it appears that the parties contemplated and intended that North Carolina law would govern said agreement, because ¶ 8 specifically refers to North Carolina law in the following manner:
 By the execution of this Agreement and any deeds, bills of sale or other instruments required to be executed by virtue hereof, the parties waive and release any and all rights that they may have or any hereafter acquire by virtue of N.C.G.S. 50-20, and specifically release all rights to a judicial distribution of the marital property, this Agreement making provisions thereof. Neither party shall make any claim pursuant to N.C.G.S. 50-20 to any property transferred to the other property of the parties.
Finally, there is no allegation that the state of North Carolina CT Page 7004 is without a substantial relationship to the matter before the court, or that North Carolina law is contrary to the fundamental policies and law of Connecticut.[1] Accordingly, the court applies the law of North Carolina to the dissolution action before it.
Because a separation agreement is a contract, courts in North Carolina apply the same rules to separation agreements as are used to interpret any other contract. Cator v. Cator,321 S.E.2d 36, 39 (N.C.App. 1984). See also Small v. Small, 379 S.E.2d 273,277 (N.C.App. 1989) (marital contracts are ordinarily determined by the same rules which govern the interpretation of contracts). Whenever a court is called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution. The heart of a contract is the intention of the parties, which is to be ascertained from the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time.Lane v. Scarborough, 200 S.E.2d 622, 624 (N.C. 1973).
When a separation agreement is in writing and unambiguous, its meaning and effect is a question of law for the court. Catorv. Cator, supra, 321 S.E.2d 39. A contract encompasses both its express provisions and such implied provisions as are necessary to effect the intention of the parties, unless express terms prevent such inclusion. Lane v. Scarborough, supra, 200 S.E.2d 624. A separation agreement should be viewed today like any other bargained-for exchange between parties who are presumably on equal footing. Knight v. Knight, 333 S.E.2d 331, 333 (N.C.App. 1985).
North Carolina's Equitable Distribution Act provides for a judicial determination of the distribution of property accumulated during marriage. Hagler v. Hagler, 354 S.E.2d 228,231-32 (N.C. 1987). Only "marital property" may be distributed under this statute; "separate property," acquired before marriage or given to one spouse by a third party, is unaffected. Id., 232, citing N.C.G.S. § 50-20(b) (Supp. 1985). Moreover, pursuant to N.C.G.S. § 50-20(d), the parties to a marriage may forego equitable distribution and decide themselves how their marital estate will be divided upon divorce. Higgins v. Higgins,364 S.E.2d 426, 428-29 (N.C. 1988) (N.C.G.S. § 50-20(d) provides that married persons may provide for division of marital property while they are cohabiting). Such agreements are favored in the state of North Carolina, as "they serve the salutary purpose of CT Page 7005 enabling marital partners to come to a mutually acceptable settlement of their financial affairs." Hagler v. Hagler, supra, 354 S.E.2d 232. Accordingly, a valid separation agreement that waives rights to equitable distribution will be honored by the courts and will be binding upon the parties. Id.
I. Duress
To be valid, a separation agreement must be untainted by fraud, must be in all respects fair, reasonable and just, and must have been entered into without coercion or the exercise of undue influence, and with full knowledge of all the circumstances, conditions and rights of the contracting parties.Eubanks v. Eubanks, 159 S.E.2d 562, 567 (N.C. 1968); Johnsonv. Johnson, 313 S.E.2d 162, 165 (N.C.App. 1984). See also Knightv. Knight, supra, 333 S.E.2d 333 (a court of equity will refuse to enforce a separation agreement, like any other contract, which is unconscionable or procured by duress, coercion or fraud).
 Duress is the result of coercion. Duress exists where one, by the unlawful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will. It may exist even though the victim is fully aware of all facts material to his or her decision.
(Internal quotation marks omitted; emphasis in original.) Stegallv. Stegall, 397 S.E.2d 306, 307-08 (N.C.App. 1990), cert. denied, 400 S.E.2d 461 (N.C. 1991), citing Link v. Link,179 S.E.2d 697, 703-05 (N.C. 1971).
In the present matter, ¶ 7(a) of the parties' agreement provides as follows:
 Wife has been represented by Lawrence S. Boehling, Attorney at Law, Burgaw, North Carolina, and Husband has been informed of his right to have his own legal counsel but he has voluntarily elected to proceed with this agreement without such counsel free from duress, coercion or undue influence from any source or any person.
Additionally, at the trial of this matter, the defendant offered insufficient factual evidence to support his claim of duress. Finally, in the memorandum of law subsequently submitted to this court, the defendant again offers insufficient factual CT Page 7006 allegations regarding his duress claim. Accordingly, the court declines to strike down the parties agreement on the ground that the defendant entered into said agreement while under duress.
II. Rescission
In North Carolina, a contract may be rescinded or discharged by acts or conduct of the parties inconsistent with the continued existence of the contract, and mutual assent to abandon the contract may be inferred from the attendant circumstances and conduct of the parties. Stegall v. Stegall, supra, 397 S.E.2d 313. To be sufficient, however, the acts and conduct of the parties must be positive and unequivocal. In re Tucci,380 S.E.2d 782, 786 (N.C.App. 1989), aff'd, 388 S.E.2d 768 (N.C. 1990). See also Campbell v. Blunt, 210 S.E.2d 513, 515 (N.C.App. 1975) (a written contract may be abandoned or relinquished by agreement between the parties, by conduct clearly indicating such purpose, and by substitution of a new contract inconsistent with the existing contract).
Even if rescission is inferred from the parties' conduct, however, only those provisions of the marital contract that remain executory are rescinded. In re Tucci, supra, 380 S.E.2d 786. See also Lambe-Young, Inc. v. Austin, 331 S.E.2d 293, 296
(N.C.App. 1985) (parties to a contract may, by a subsequent agreement, rescind the contract if the contract remains executory and if the parties in their later agreement act upon sufficient consideration). Moreover, the rescission of a separation agreement requires proof of a material breach — a substantial failure to perform. Cator v. Cator, supra, 321 S.E.2d 38. See also Southeastern Drywall, Inc. v. Yeargin Construction Co.,214 S.E.2d 303, 307 (N.C.App. 1975) (before contract rescission is justified for failure to strictly perform, it must be shown that default was substantial). Additionally, rescission differs from breach of contract by abandonment or repudiation by one party, so recognized by the other since rescission requires mutuality, express or implied.
In the present case, the defendant did transfer back the North Carolina property to the plaintiff, after the execution of their agreement, in exchange for the plaintiff's cancellation of the promissory note previously executed by him in the amount of $100,000.00. However, there is insufficient evidence before the court to conclude that either the defendant or the plaintiff intended that the substance of their agreement was to be CT Page 7007 nullified or invalidated by this transaction. That is, there is insufficient evidence to conclude that the parties mutually agreed and intended that the defendant was to go from receiving approximately $13,000.00 in equity in the home, under the agreement, to receiving absolutely nothing.
Additionally, neither of the parties argues that their agreement was rescinded in this manner, as a result of this transaction. The plaintiff argues that the agreement remains valid and enforceable in all respects, despite this transaction. Moreover, although the defendant argues that the provisions of the agreement should be held null and void, he does so on the ground that the parties resumed their marital relations, rather than on the ground that the above described transaction rescinded the parties' agreement. Accordingly, the court declines to invalidate the parties' agreement on the ground that it was rescinded by the plaintiff's action in cancelling the promissory note in exchange for the defendant's return of the property.
III. Resumption of Marital Relations
In North Carolina, "[t]he resumption of marital relations[2] after the execution of a marital agreement terminates the executory provisions[3] of a separationagreement." (Emphasis added.) Morrison v. Morrison,402 S.E.2d 855, 858 (N.C.App. 1991), citing In re Adamee, 230 S.E.2d 541,545 (N.C. 1976). "However, the resumption of marital relations after the execution of a marital agreement does not necessarily, though it may, rescind the executory provisions of a propertysettlement agreement." (Emphasis added.) Morrison v. Morrison, supra, 402 S.E.2d 858.[4]
 A separation agreement is defined as a contract between spouses providing for marital support rights and is executed while the parties are separated or are planning to separate immediately. [T]he heart of a separation agreement is the parties' intention and agreement to live separate and apart forever . . . . A property settlement agreement provides for a division of real and personal property held by the spouses. The parties may enter a property settlement at any time, regardless of whether they contemplate separation or divorce . . . . A property settlement contains provisions . . . which might with equal propriety have been made had no separation been contemplated . . . . CT Page 7008
(Citations omitted; internal quotation marks omitted.) Id.
Whether the executory provisions of a property settlement agreement are rescinded upon the resumption of marital relations in a given case depends upon whether the property settlement is negotiated in "reciprocal consideration" for the separation agreement. Id.
 If the property settlement is negotiated as "reciprocal consideration" for the separation agreement, the agreements are deemed integrated and the resumption of marital relations will terminate the executory provisions of the property settlement agreement. If not in reciprocal consideration, the provisions of the property settlement are deemed separate and the resumption of marital relations will not affect either the executed or executory provisions of the property settlement agreement.
Id. Further, although contracts providing that a reconciliation will not affect the terms of a property settlement are not contrary to law or public policy, contracts which provide that reconciliation will not affect the terms of a separationagreement do violate the policy behind separation agreements, and are therefore void. Id., 859.
"Whether the property settlement agreement was negotiated as reciprocal consideration for the separation agreement `requires a determination of the intent of the parties regarding integration or non-integration of' its provisions." Id., quoting Hayes v. Hayes,394 S.E.2d 675, 680 (N.C.App. 1990).
 The answer depends on the construction of the consent judgment as a contract between the parties. The heart of a contract is the intention of the parties. The intention of the parties must be determined from the language of the contract, the purposes of the contract, the subject matter and the situation of the parties at the time the contract is executed.
(Citations omitted; internal quotation marks omitted.) Whitev. White, 252 S.E.2d 698, 702 (N.C. 1979), quoted in Whitev. Bowers, 400 S.E.2d 760, 763 (N.C.App. 1991). Where the parties include unequivocal integration or non-integration clauses in CT Page 7009 their agreement, this language governs. Morrison v. Morrison, supra, 402 S.E.2d 859, citing In re Tucci, supra, 380 S.E.2d 787. Otherwise, a presumption exists that the provisions of a marital agreement are separable, and the burden of proof to establish the contrary is on the party claiming that the separation provisions and the property settlement provisions of an agreement are integrated. Morrison v. Morrison, supra, 402 S.E.2d 859.
In the present case, the parties' agreement itself establishes that the separation provisions and property settlement provisions of the agreement are independent and unrelated, because ¶ 12 specifically provides that:
 It is mutually agreed that each Article of this Agreement has been separately and individually agreed upon and contracted for by and between the parties and this Agreement or any subsection hereof, or any breach of any Article of this Agreement or subsection hereof by either party is specifically agreed to have no effect on the remainder of the Agreement which shall remain and continue in full force and effect.
In this regard, ¶ 1 of the parties' agreement provides, in pertinent part, that the parties:
 mutually agree at all times to live separate and apart from each other during the terms of their natural lives . . . [,]
while ¶ 10(c) of the agreement sets forth the terms of the parties' distribution of the North Carolina property. From the foregoing analysis, the court concludes that the language of the contract, its purpose and the respective circumstances of the parties evidence an intent on the part of the parties to separate the support and property provisions.
Moreover, ¶ 13 of the agreement specifically addresses the very issue currently before the court as follows:
 In the event of reconciliation and resumption of the marital relationship between the parties, the provisions of this agreement for settlement of property rights shall nevertheless continue in full force and effect without abatement of any term or provision hereof, except as otherwise provided by written agreement duly executed byCT Page 7010 each of the parties after the date of the reconciliation
except that parties acknowledge that they are currently contemplating a reconciliation . . . .
Accordingly, any alleged resumption of marital relations had absolutely no effect on the parties' agreement, because, according to the very terms thereof, said agreement was to "continue in full force and effect" despite reconciliation, unless the parties subsequently provided otherwise in a duly executed written agreement. Neither of the parties claims such a written agreement was executed. Accordingly, the court finds that the parties' North Carolina agreement remains in full force and effect.
IV. Enforcing the Agreement
After the parties executed their agreement regarding the distribution of the North Carolina property, said property was sold to a third party. Accordingly, the terms of the parties agreement, whereby the plaintiff was to receive $100,000.00 in exchange for transferring the property to the defendant, may not be specifically enforced. Nonetheless, the court may properly seek to ascertain the intent of the parties by analyzing the terms of their agreement, and give effect to those intentions as best that it can.
The parties purchased the property in 1990 for $128,000.00, taking out a first mortgage of $15,000.00. Under the terms of the parties' agreement, the plaintiff was to receive $100,000.00, while the defendant was to receive the property and assume responsibility for the payment of the $15,000.00 mortgage. Accordingly, in a strict dollar sense, the parties' intent was for the plaintiff to receive $100,000.00, while the defendant was to receive $13,000.00[.] That is, the parties believed that the husband's equity in the property was $13,000.00. This figure is derived from the following calculation:
$128,000.00 price paid for house by parties —
$100,000.00 promissory note to plaintiff from defendant —
$ 15,000.00 mortgage on property to be paid by defendant.
These respective figures, of $100,000.00 and $13,000.00, are equitable because, although (1) the plaintiff and defendant CT Page 7011 originally purchased the property with the proceeds acquired by the plaintiff from the sale of separate property owned by her in Connecticut, (2) the plaintiff likely acquired a higher price for her Connecticut property than she otherwise would have, because the defendant's company purchased it as part of its relocation offer to the defendant, and (3) the defendant made significant contributions to the mortgage and household expenses. Accordingly, the plaintiff is ordered to pay the defendant $13,000.00 under the agreement.
The court adopts the rulings of Spallone, S.T.R., on October 17, 1994, with regard to the motion for alimony pendente lite and counsel fees. No order for alimony or counsel fees may enter and the only order is for the plaintiff to pay the defendant $13,000.00 as property settlement.
The court finds the plaintiff has resided continuously within the State of Connecticut for one year prior to the bringing of this complaint, the marriage of the parties has broken down irretrievably and there are no minor children issue of the marriage.
A decree may enter dissolving the marriage.
O'CONNELL, J.